BARRY THORNTON *vs.* CIVIL SERVICE COMMISSION & another.[1]

No. 10-P-1075.

Suffolk. April 14, 2011. - September 21, 2011.

Present: KANTROWITZ, BROWN, & RUBIN, JJ.

*Civil Service,* Fire fighters, Decision of Civil Service Commission, Judicial review. *Fire Fighter. Municipal Corporations,* Fire department. *Public Employment,* Suspension. *Administrative Law,* Hearing. *Statute,* Construction.

In a civil action challenging a decision of the Civil Service Commission upholding a town's suspension of a fire fighter without granting him a hearing beforehand, the judge properly concluded that the suspension violated G. L. c. 31, § 41, where the suspension period constituted ten calendar days (not counting Saturdays, Sundays, and holidays), which exceeded the period of "five days or less" permitted in the statute for suspensions that do not require such a hearing. [446-451] KANTROWITZ, J., dissenting.

CIVIL ACTION commenced in the Superior Court Department on May 5, 2009.

The case was heard by *Regina L. Quinlan,* J., on a motion for judgment on the pleadings.

*Michael C. Gilman* for town of Andover.

*William D. Cox, Jr.,* for the plaintiff.

The following submitted briefs for amici curiae:

*John M. Collins* for Fire Chiefs Association of Massachusetts, Inc.

*Brian Rogal* for Professional Fire Fighters of Massachusetts.

*Harold L. Lichten* for Andover Fire Fighters Union Local 1658 IAFF.

RUBIN, J. This case presents a question about the length of a suspension that may be imposed without a hearing under G. L. c. 31, § 41, a provision of the civil service statute.

[1]Town of Andover.

*Background.* The plaintiff, Barry Thornton, was, at the relevant time, a lieutenant with the fire department (department) of the town of Andover (town). At the time of the events that gave rise to this action, he had been employed by the town for approximately twenty years. He had never been subject to any prior disciplinary action.

General Laws c. 31, § 41, provides tenured civil service employees, i.e., those who are not employed for a limited, specified period of time or on an initial probationary basis, with certain procedural protections before disciplinary action may be taken. In particular, a tenured employee shall not be "discharged, removed, suspended for a period of more than five days, laid off, transferred from his position without his written consent . . . , lowered in rank or compensation without his written consent, nor his position be abolished," except for "just cause" and without first being given written notice by the appointing authority and a hearing "before the appointing authority or a hearing officer designated by the appointing authority." G. L. c. 31, § 41, inserted by St. 1978, c. 393, § 11.

Consistent with this language, there is an explicit exemption under which "[a] civil service employee may be suspended for just cause for a period of five days or less without a hearing prior to such suspension." *Ibid.* A series of procedural protections still attach after the imposition of such a suspension, including notice, delivery of a copy of certain sections of the civil service statute to the employee, and an entitlement to a prompt hearing upon request and a prompt decision after the hearing.[2] Section 41 also provides that "Saturdays, Sundays and legal holidays shall not be counted in the computation of any period of time specified in this section." *Ibid.*

On May 3, 2008, Thornton and his crew, which consisted of two other firefighters, were dispatched to respond to a report of an elderly man having fallen down on a sidewalk. At the time of the call, an ambulance from North Andover was already responding. Upon arrival at the scene, Thornton and his crew were met by Andover police Officer Joseph Maggliozzi, who

---

[2]Thornton contended before the Civil Service Commission that a number of the procedural protections set out in the statute were not afforded him. He does not renew these objections on this appeal.

had called for assistance after observing the man bleeding from his nose and hand. Maggliozzi reported that the man had gone to a friend's office inside the building in front of which he had fallen. The man had refused treatment and insisted that he was fine.

Thornton and his crew went into the office building, carrying a medical jump bag, a defibrillator, and oxygen equipment, to try to locate the man who had fallen. After a search, they found him on the second floor in the office of his friend. Thornton's crew cleaned and bandaged the cuts on the man's hand, nose, and knee. Because the man refused transport to the hospital for his cuts and bruises, Thornton canceled the ambulance from North Andover that had been called to the scene. Shortly after the incident, Fire Chief Michael B. Mansfield received a telephone call from a relative of the man to thank the responding crew for their kindness to him.

When the department evaluates individuals and transports them to a medical facility, it assesses a charge that is then submitted to the individual's insurance carrier based on insurance information collected at the scene. During the time at issue, the medical response charge was seventy-five dollars.

Approximately five months before the date of the incident, Mansfield had issued a memorandum to all department personnel, including Thornton, that provided in part: "Effective Sunday December 2, 2007, all individuals who are evaluated by Andover Fire Rescue personnel and not transported to a medical facility shall continue to have a medical release signed by the patient." The memorandum made clear that the purpose of this policy change was to obtain reimbursement from insurance companies for all emergency medical services and generate additional revenue, including for calls where a citizen is not transported to the hospital. Members of the department are instructed to use a two-sided, multi-copy ambulance report form when documenting medical responses. The front side of the form is for documenting patient information, insurance information, observations from examining the patient, and a narrative statement. The back of the form, among other things, provides a place for a signature when the patient refuses medical transport.

A "citizen assist" by the department involves a situation

where no medical treatment is required, such as assisting an individual who needs to be placed in a chair or helped from a car into a house. In "citizen assist" cases, the department does not assess a charge.

When the man involved in the May 3, 2008, incident refused an ambulance, a member of Thornton's crew wanted the man to fill out a patient refusal form. Thornton instructed the crew member not to have the form filled out.[3] Thornton subsequently filled out a fire incident report that stated that the incident was a "citizen assist." Thornton testified before the Civil Service Commission (commission) that he did not think the elderly man should be charged a fee for "some sterile water and gauze pads."

When Mansfield received the telephone call seeking to thank the responding crew, he sought to put a letter of recognition in the employees' personnel file. He was, however, unable to locate a patient refusal form that matched the address at which the incident had taken place. Mansfield requested that Thornton and the two members of his crew each provide him with a written report as to what occurred.

The two members of Thornton's crew submitted written reports that referred to Thornton's decision not to have the man sign a patient refusal form.[4] On May 29, 2008, Mansfield suspended Thornton, citing eighteen violations of the department's rescue rules and regulations. Thornton's suspension commenced on June 22, 2008, at 8 A.M., and concluded on July 7, 2008, at 8 A.M. Thornton's work schedule operated on an eight-day cycle. Thornton was on duty for twenty-four hours beginning at 8 A.M., then off duty for a twenty-four hour period, then on duty for another twenty-four hour period, then off duty for five twenty-four hour periods. Consistent with this schedule, during the time of his suspension Thornton was scheduled to work four twenty-four hour shifts, each running from 8 A.M. to

---

[3] When Thornton, a twenty-year veteran of the department, was pressed by his crew on the way back from the incident about the paperwork, he responded with a profanity about "the Chief and his $75." Mansfield had been with the department for only fifteen months prior to the incident.

[4] Thornton did not deny this, but he claimed that he did not have a recollection of the call and that his narrative contained in the incident report indicated that it was a citizen assist.

8 A.M., on June 22 to 23, June 28 to 29, June 30 to July 1, and July 6 to 7, 2008. His suspension thus prohibited him from working four scheduled twenty-four hour shifts, spread over eleven weekdays, which included one holiday, and five weekend days, during a sixteen-day period. Ordinarily firefighters like Thornton are permitted to work on fire or police details on their days off as overtime or private duty. During the suspension period, however, Thornton was also expressly prohibited from working any fire or police details during his off-duty hours, including on the many days that he was scheduled to be entirely off.

Thornton was entitled to request a hearing before what § 41 describes as the "appointing authority," in this case the town manager, and on May 29, 2008, the day he received notice of the suspension, he did so. On August 6, 2008, the town manager upheld Thornton's suspension.

Thornton filed procedural and substantive appeals with the commission. Pursuant to G. L. c. 31, § 43, Thornton argued that the town did not have just cause to suspend him from the department. Pursuant to G. L. c. 31, § 42, he argued that the town had failed to hold a timely hearing, to provide him with a copy of G. L. c. 31, §§ 41 through 45, as required by § 41, and to provide proper notice, and that Mansfield lacked the authority to issue the suspension because Mansfield had not properly been delegated the authority to suspend him and because the suspension was effectively for more than five days thereby requiring a presuspension hearing.

By a three-to-two vote, the commission after a hearing concluded that there was just cause for the suspension. On the issue of the length of the suspension, the commission stated that G. L. c. 31, § 41, "appears to speak to 'calendar' *work* days." The commission majority then concluded that the suspension imposed by the town was a four-day suspension and therefore a hearing was not required prior to the issuance of the suspension. The three-commissioner majority, however, decided to reduce Thornton's period of suspension to two days after finding that the town had "overreached" and "piled on" by charging Thornton with eighteen violations.

Thornton sought judicial review in the Superior Court, pursu-

ant to G. L. c. 31, § 44, of the commission's decision denying his claims for relief. In her decision on a motion for judgment on the pleadings, a judge concluded that the statutory phrase "five days or less" in § 41 means five calendar days, that is, "the space of time that elapses between two successive midnights." The judge found that Thornton's suspension period began at 8 A.M. on June 22, 2008, and lasted until 8 A.M. on July 7, 2008, and that Thornton was "prohibited from working any details [on his days off,] which would otherwise have been available."

The judge counted all the days in the suspension period, which she concluded amounted to sixteen days. She then subtracted Saturdays, Sundays, and legal holidays that occurred within that period, pursuant to the language in G. L. c. 31, § 41, that states, "Saturdays, Sundays and legal holidays shall not be counted in the computation of any period of time specified in this section." The judge concluded that the suspension period was for a duration of ten days, that a suspension of such a length could not be imposed without a hearing under § 41, and that the suspension was imposed in violation of the statute. The judge ordered that Thornton be reinstated without loss of compensation. The town now appeals.

*Discussion.* Having examined G. L. c. 31, § 41, and its structure, we conclude that the words "a period of five days" must be read essentially as the Superior Court judge read them, to describe a single, continuous period covering five twenty-four hour days. The Legislature used the singular noun "period" to describe suspensions that could be imposed without a hearing. The most natural reading of that word is a continuous interval of time, not an amount of time encompassed by a series of nonconsecutive calendar days calculated without regard to the total amount of time that elapses from the first to the last suspension day.

This reading is bolstered by language elsewhere in the civil service statute. The only other place within that statute where the Legislature used the "period of [a specified number of] days" formulation is in G. L. c. 31, § 38, which addresses unauthorized leaves of absence. Section 38, inserted, as § 41 was, by St. 1978, c. 393, § 11, provides that "unauthorized absence shall mean an absence from work for a period of more

than fourteen days for which no notice has been given." Section 38 has no language requiring that weekends and holidays not be counted.

The most natural way to read the formulation as it is used in § 38 is that the Legislature had in mind a two-week period, i.e., absence during a continuous period of fourteen days, not an absence from fourteen consecutive days of work spread over an indefinite period. The identical phrase in § 41, adopted in the same statute as the language in § 38, must be read in the same way — to indicate a consecutive period of the specified number of days.

Further, § 41 provides that "Saturdays, Sundays and legal holidays shall not be counted in the computation of any period of time specified in this section." That language both suggests that a "period" of time specified in § 41 should be read to be continuous and, in its application to the rule for suspensions without a hearing, ensures that for individuals working a traditional five-day, Monday-through-Friday work week, the maximum suspension period is not undermined if it runs across a weekend. Indeed, the practical effect of the weekend and holiday provision is to allow imposition without a hearing of a suspension lasting a seven-day week (eight in the case of holidays), covering, in the case of the traditional forty-hour work week, five work days.[5]

The town argues, and our dissenting brother concludes, that G. L. c. 31, § 41, allows suspension of an employee without a hearing for up to five "calendar work days." It contends that because of the firefighters' unusual schedule, this is the only way to ensure that such a suspension falls on five work days, not on a period including several days off.

To begin with, the plain language of § 41 will not bear this reading. As described above, § 41 only allows suspensions without a hearing that are for "a *period* of five days or less"

---

[5]Despite our dissenting brother's suggestion to the contrary, we do not read five days to mean a seven-day week. We read five days to mean five days. Because of the express language of § 41, weekend days and legal holidays are not counted in the computation of the five-day period. In light of our conclusion, we may leave for another day whether the maximum period must run on calendar days (i.e., from midnight to midnight), or whether it may run for any consecutive five-day period (e.g., noon to noon).

(emphasis added), which is most naturally read as a continuous interval of time. Moreover, § 41 does not refer to "work days," but to "days." Whether a "day" is a calendar day or a twenty-four hour day, unless modified by the word "work," it is not a "work day" (or a calendar work day). Finally, the exclusion of weekends and holidays would be incomprehensible if the "period" covered only calendar work days.

The dissent argues that under our reading a firefighter suspended for two days might not be suspended for any work days at all given a firefighter's eight-day work schedule. However, nothing in § 41 prohibits a fire chief from initiating a suspension on the day of his or her choosing, in order to ensure that a firefighter is not able, because of his or her particular work schedule, to avoid the effects of the suspension.

And, as the dissent notes, due to an unusual aspect of work as a firefighter, the calendar work day reading is problematic. Because of the possibility of a firefighter doing detail work on days off, the suspension for five scattered scheduled work days that the dissent would allow might not serve the purpose of punishment that the Legislature intended. The firefighter may simply be able to do detail work on the days off between the dates of the five days on which he or she is suspended. The "suspended" firefighter thus might be able to make as much in a work week as he or she otherwise would. While the dissent itself demonstrates that reasonable minds can differ, it appears to us that it is our dissenting brother's reading under which, after a five-day suspension, it might wind up being "as if nothing had happened." *Post* at 452. By contrast, our reading, in addition to being faithful to the text and structure of § 41, ensures that some actual punishment may be meted out without a hearing, which is what the Legislature intended.

The town's position is that to address the problem of detail work, it must be able, without a hearing, to suspend an employee like Thornton from working not only on five scattered calendar work days, but also from working details on the days in between. The commission did not address this aspect of the case. While there is some logic to the town taking the position it does — it is apparently necessary if the calendar work day rule is to have any real financial consequence — the result of its reading would

be to allow suspensions for more than five days to occur without a hearing, like the sixteen-day one imposed on Thornton in this case. Whatever a suspension of "a period of five days or less" is, it is not a suspension under which an employee may not work for sixteen days.

The reading we adopt does not allow the avoidance of penalty that the dissent's five scattered work day reading would. The fixed period of time allowed for a suspension without a hearing would be roughly equitable. For a firefighter like Thornton, a five-day period of suspension without a hearing that, because of the weekend-day exclusion, spans seven calendar days will encompass, at most, two scheduled twenty-four hour work periods, what most fire departments denominate as two ten-hour daytime shifts and two fourteen-hour overnight shifts. Although the firefighter would be suspended for a calendar week, he or she would lose forty-eight work hours and would not be able to work all the other days that week in which he or she might otherwise have made up the lost time through doing paid detail work for the fire department.[6] This is roughly equivalent to the suspension that may be imposed without a hearing on a nine-to-five civil service employee.

Our dissenting brother argues that the five calendar work day reading is a "long-accepted practice[]" and long-standing commission construction of the statute. *Post* at 453. If it were, and if it were reasonable, it would be, as he properly notes, due substantial deference. In particular, where the commission is closer to the practicalities of work schedules among various civil servants, its expertise, expressed in a thoughtful and long-standing construction of the statute it administers, entitles it to such deference.

But the town does not argue, and there is no evidence, that the calendar work day reading represents a long-standing, consistent commission construction or, indeed, that it reflects any long-accepted practice. This precise statutory language has been on the books since 1978. See St. 1978, c. 393, § 11. Yet the dissent can point only to a single 2006 commission case that

---

[6]We express no opinion whether a firefighter suspended without a hearing under § 41 may be prohibited as part of his suspension, as the plaintiff was here, from working police details.

has adopted the calendar work day construction, albeit without discussion or elaboration. See *Ouillette* v. *Cambridge*, 19 Mass. Civ. Serv. Rep. 299, 303 (2006). The second commission case cited by the dissent, *Baldasaro* v. *Cambridge*, 10 Mass. Civ. Serv. Rep. 134 (1997), does not adopt that reading; the only reference to calendar work days appears, rather, in the administrative magistrate's recommended decision that was *rejected* by the commission but was included as an appendix to the commission's decision for its description of the facts of the case. The amicus brief quoted in the dissenting opinion refers to "hundreds" of cases, but it cites, and our research has revealed, none. See *post* at note 7.

Further, while the commission in this case appears to have construed § 41 to mean five calendar work days, each of which consists of up to a twenty-four hour period, it did not directly address the fact that Thornton was not allowed to work on the days in between what it determined were four work days — the dissenting opinion cites only the town's assertion that these days are irrelevant. "A reviewing court accords due weight and deference to an agency's reasonable interpretation of a statute within its charge, but '[t]he duty of statutory interpretation is for the courts.' " *Police Commr. of Boston* v. *Cecil*, 431 Mass. 410, 413 (2000) (citations omitted). Construing the sixteen-day prohibition on Thornton's working as a four-day suspension, one that requires no presuspension hearing because it is for "a period of five days or less," is not a reasonable way of reading the statutory language.

In any event, we are not free to ignore the language adopted by the Legislature; nor is our reading "absurd or unreasonable" such that we might be persuaded to follow our dissenting brother by taking the controversial tack of declining to "adopt a literal construction of [the] statute." See *post* at note 4. To be sure, one can imagine instances in which the rule adopted by the Legislature may lead to anomalous or inequitable results depending on the nature of a particular individual's work schedule. While we express no opinion on the way in which G. L. c. 31, § 41, must be applied in the face of different methods for calculating employee compensation, an employee working a sixty-hour week may suffer graver consequence from a five-day

suspension than one working only forty hours per week. But, again, if this is so, it is the consequence of the Legislature choosing a measure of days. Indeed, the same problem would exist under the town's reading of the statute: the penalty imposed would be harsher or less harsh depending upon the number of hours per day worked by the employee. And of course, under our reading, the town remains free to suspend its civil service employees for longer than five days. All it need do is hold a presuspension hearing.

Because the suspension in this case exceeded five days, the town could not properly impose it without a holding a hearing first. Consequently, the judgment is affirmed.

*So ordered.*

KANTROWITZ, J. (dissenting). Perhaps indicative as to how entrenched the understanding was that five days meant five work, not calendar, days, Barry Thornton primarily wished only to be allowed to work details during the time he was suspended.[1] The lower court judge took a different path by ruling that five days meant five calendar days. The majority travels a somewhat similar route and holds essentially that five days means one seven-day week.

I start with the oft quoted rule, bypassed here, that an "administrative agency's interpretation of a statute within its charge is accorded weight and deference." *Eastern Cas. Ins. Co.* v. *Commissioner of Ins.*, 67 Mass. App. Ct. 678, 683 (2006) (citation omitted). This should be especially so in areas in which the work week is at odds with not only the traditional nine-to-five one, but the very number of days in the week itself. Thornton worked an eight-day work week.[2]

The majority opinion recognizes, implicitly at least, the problem with the lower court's decision, which would result in

---

[1]In his brief, Thornton claims that what he "lost during the period of suspension was the opportunity to accept additional overtime and detail shifts due to his 'temporary withdrawal or cessation from public work.' "

[2]His eight-day week consisted of twenty-four hours on, twenty-four hours off, twenty-four hours on, and five twenty-four hour periods off. This apparently is what the firefighters bargained for.

the following scenario. If an individual is suspended for, say, two days when that person is not scheduled to work, there is in reality no suspension at all. The individual would arrive at work his next scheduled shift as if nothing had happened (which would be true, as nothing had). The same could be true for working details.[3] Such outcomes hinder order, morale, and discipline.[4]

The majority now imposes a different interpretation, saying essentially that a five-day suspension should be meted out over a seven-day week. Similar problems arise, the most troublesome one being that the majority's opinion interferes with a fire chief's ability to appropriately discipline those he commands, in that fire chiefs are now prohibited from suspending a recalcitrant employee for five work days (including all details in between).

As for Thornton's original complaint, that he was being prohibited from working details, suffice it to say that details and overtime are not considered part of one's base salary. See *Selectmen of Framingham* v. *Municipal Ct. of Boston*, 11 Mass. App. Ct. 659, 660-661 (1981); *White* v. *Boston*, 57 Mass. App. Ct. 356, 360 (2003) ("Statutory salaries are not based on an assumption of extra-duty pay").[5]

Lastly, not every work week is a Monday-to-Friday, forty-hour one, and not every work day consists of eight hours. This is especially so in the world of firefighters and police officers. The firefighters here bargained for their contract, their eight-day work week, and their twenty-four hour work days. Thornton was aware of a "regular workday"[6] and the scheduling needs of firefighters — eight-day schedules of twenty-four hours on,

---

[3]In fact, a person with overtime pay for working details could make more while being suspended for two days than actually going to work (which explains Thornton's original concern).

[4]"We will not adopt a literal construction of a statute if the consequences of such construction are absurd or unreasonable. We assume the Legislature intended to act reasonably." *Champigny* v. *Commonwealth*, 422 Mass. 249, 251 (1996), quoting from *Attorney Gen.* v. *School Comm. of Essex*, 387 Mass. 326, 336 (1982).

[5]The motion judge wrote, "The appointing authority also found that the prohibition on the plaintiff performing details during that period did not implicate Civil Service since compensation from details was not considered regular earnings."

[6]The Civil Service Commission held in *Ouillette* v. *Cambridge*, 19 Mass.

twenty-four hours off, twenty-four hours on, and five twenty-four hour periods off. Each department and agency has different scheduling needs, and it is only fair and consistent for the Civil Service Commission (commission) to define "days" as the days for which a person has negotiated, is scheduled to work, and receives pay, i.e., "work days." The work schedule that benefits a worker may at times also burden him.

It makes eminent sense that "day," as used in G. L. c. 31, § 41, means a work, not calendar, day. It appears that this is the long-term interpretation of the commission, to which we ordinarily give deference; for years the commission has apparently disciplined workers using "work days." See, e.g., *Ouillette* v. *Cambridge*, 19 Mass. Civ. Serv. Rep. 299 (2006), citing *Baldasaro* v. *Cambridge*, 10 Mass. Civ. Serv. Rep. 134 (1997).[7]

As the majority's decision appears to depart from long-accepted practices and a reasonable interpretation of the statute at issue, I respectfully dissent.

---

Civ. Serv. Rep. 299, 303 (2006), that a work day is a work day regardless of whether it is eight hours or 13.3 hours (or, if I might add, twenty-four hours as in our case).

[7]That there is little case law on the issue is perhaps due to the fact that it was so widely accepted. As is stated in the amicus brief submitted by the Fire Chiefs Association of Massachusetts, Inc., in this case, "The only common sense interpretation of the legislature's intention was to have the five-day limit on a department head's ability to impose a suspension apply to a 'work day.' That is precisely how the Civil Service Commission interpreted it in hundreds of cases over the years." That this court is so uncertain on this very point indicates why we should give deference to the commission.